UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| LAWRENCE O. ANYASO, ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> UNITED STATES CAPITOL POLICE, ) <br> ) <br> Defendant. ) <br> ) | Civil Action No. 12-1327 (ESH) |

# MEMORANDUM OPINION

Lawrence Anyaso is an African-American officer in the United States Capitol Police ("USCP"). On August 10, 2012, he filed suit against the USCP alleging discrimination on the basis of race in violation of the Congressional Accountability Act ("CAA"), 2 U.S.C. § 1408, *et seq.*, and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq*. (Compl., Aug. 10, 2014 [ECF No. 1], at ¶¶ 1, 36.) He later amended his complaint to allege that he also had been unlawfully retaliated against for engaging in statutorily protected activities. (Amend. Compl., Dec. 27, 2012 [ECF No. 7], at ¶¶ 42-43.) Presently before the Court is defendant's Motion for Summary Judgment (Dec. 16, 2014 [ECF No. 17] ("Mot.")). For the reasons stated below, this motion will be granted.

# FACTUAL BACKGROUND

This case stems from a traffic accident involving plaintiff, the subsequent investigation into that accident, and the disciplinary actions taken by the defendant as a result.[1] On May 28, 2011, Officer Anyaso, then an eight-year veteran of the USCP, was in his patrol vehicle when a call came over the police radio indicating that a domestic assault was in progress at a nearby location. Anyaso informed his dispatchers that he was going to respond to the call and he proceeded directly to the area where the assault was allegedly taking place. (Def.'s Statement of Undisputed Material Fact ("SOF") [ECF No. 17-1], at ¶ 3; Amend. Compl. at ¶ 10.) When Officer Anyaso arrived, he was advised by a witness that the alleged perpetrator was no longer present at the location. (*See* SOF at ¶ 4; Amend. Compl. at ¶ 11.) Officer Anyaso then proceeded to search the area for the alleged perpetrator. During this search, Anyaso engaged in what the USCP refers to as "Code One" protocols. "Code One" is the USCP designation for operating a vehicle with emergency equipment activated. (Decl. of Kimberlie Bolinger ("Bolinger Decl."), Def.'s Ex. 4 [ECF No. 17-5], at ¶¶ 4-8.) The USCP directives do not permit "Code One" protocols to be used when pursuing non-violent felonies, misdemeanors, crimes

---

[1] While plaintiff attached a "Statement of Genuine Issues Setting Forth All Material Facts" to his opposition as is required under Local Rule 7(h), the Court notes that it is troubled by the dearth of citations to the record in this document in direct contravention of Local Rule 7(h)'s requirement that this document "shall include reference to the parts of the record relied on to support the statement[s therein] . . . ." Plaintiff also failed to include a single record exhibit with his opposition so that the Court, in many instances, could not read the cited exhibit or deposition transcript. Plaintiff belatedly attempted to rectify this and other problems in a "Corrected Memorandum in Opposition to Defendant's Motion for Summary Judgment," which he sought leave to file on February 24, 2014, two weeks after filing his original opposition. This Court denied plaintiff leave to file this corrected opposition for the reasons described at length in its Memorandum Opinion and Order dated February 27, 2014 [ECF No. 27]. The Court thus relies on the D.C. Circuit's guidance in *S.E.C. v. Banner Fund Int'l*, 211 F.3d 602, 615-16 (D.C. Cir. 2000), explaining that "[i]f the party opposing the motion fails to comply with the local rule, then the district court is under no obligation to sift through the record and should instead deem as admitted the moving party's facts that are uncontroverted by the nonmoving party's . . . statement." (internal citations and quotation marks omitted).

against property, or traffic violations. (*Id.* at ¶ 7; *see also* Bolinger Decl. Attach. 2, "USCP Operational Directive TRF," at 1.4.3 ("Employees will not engage in vehicular pursuit to apprehend perpetrators of the following offenses: (a) non-violent felonies, (b) misdemeanors, (c) crimes against property, [and] (d) traffic violations.").) In addition, USCP officers are only permitted to use Code One protocols when they are "pursuing" a suspect. (*See* Bolinger Decl. Attach. 2, at 1.4.1 ("When operating an authorized USCP pursuit vehicle with emergency devices activated, sworn employees may engage in *pursuit* of a vehicle . . . ." (emphasis added).) The same departmental directives require that when an officer is operating pursuant to Code One protocols, he or she still must exercise due regard for the safety of all persons and potential traffic hazards. (*See* Bolinger Decl. Attach. 2, at 1.4.2.)

While proceeding in a Code One mode in search of the suspect, Officer Anyaso drove through a red light at the intersection of Fourth Street and E Street in Southeast D.C. As he did, he collided with another, non-police vehicle. (SOF at ¶ 6.) As a result of the accident, plaintiff and one passenger from another vehicle were taken to the hospital. (*Id.* at ¶ 18.) Officer Anyaso's vehicle sustained more than $15,000 worth of damage. In addition, USCP was deemed liable in tort for more than $19,000 in damages to the owner of the other vehicle. (*Id.* at ¶¶ 16-17.)

In response to the crash, the USCP conducted an extensive investigation. During the course of this investigation, Officer Anyaso was not permitted to drive a USCP vehicle and was assigned a fixed-post patrol. In addition, the USCP required that he complete a driver recertification course in August 2011. (*Id.* at ¶¶ 23-24, 29.)

The initial investigation of the crash was conducted by Officer Ryan Ford, a trained investigator. (Decl. of Ryan D. Ford, Def.'s Ex. 7 [ECF No. 17-8], at ¶¶ 3-4.) ) His

3

investigation included an interview with Officer Anyaso. (*Id.* at ¶ 5.) During this interview, Officer Anyaso was able to respond to only eight of Officer Ford's twenty-five questions. (*Id.*) Based on his investigation, Officer Ford concluded that the accident was preventable. (*Id.* at ¶ 7.) The case was then referred to the Office of Professional Responsibility ("OPR") to confirm whether plaintiff violated departmental rules and make a recommendation to the Bureau Commander regarding any disciplinary action. (Bolinger Decl. at ¶¶ 3, 11, 13-14.) Robin Matthew, a Disciplinary Review Officer in the OPR, was assigned to the case. Based on the investigation, she recommended that Officer Anyaso be issued a CP-534 (a form documenting command discipline that carries a penalty of no more than twenty-four hours leave or pay) and the loss of sixteen hours of leave or pay. (Dep. of Robin J. Matthew ("Matthew Dep."), Def.'s Ex. 8 [ECF No. 17-9], at 33.)

Thereafter, OPR Commander Kimberlie Bollinger reviewed Ms. Matthew's recommendation. She determined that the investigation had not been sufficiently thorough and the limited evidence suggested that plaintiff had been canvassing and not pursuing a suspect at the time of the accident. (Bolinger Decl. at ¶¶ 14-15.) She also expressed concern that the victims in the other vehicle had not been interviewed as part of Officer Ford's investigation. Commander Bollinger therefore assigned Sergeant Mark Shutters to conduct a more thorough OPR investigation of the accident. (*Id.* at ¶ 16.)

Sergeant Shutters' investigation revealed several additional facts which, he believed, demonstrated a preponderance of credible evidence that Officer Anyaso had failed to operate the USCP vehicle in an appropriate manner. (*Id.* at ¶ 17.) These facts included that:

- Officer Anyaso proceeded Code One while canvassing, not pursuing, a suspect in violation of departmental policy;

4

- Officer Anyaso failed to wear a seat belt and exceeded the *prima facie* speed limit when he passed through a red light signal;
- Officer Anyaso failed to ensure the intersection was free of potential traffic hazards and failed to slow or stop at the intersection; and
- Officer Anyaso failed to recall the majority of details of the accident when interviewed about the incident.

(*Id.* at ¶¶ 18-22.) Based on these facts, Sergeant Shutters sustained the charges against Officer Anyaso. The Disciplinary Review Office recommended, based on Sergeant Shutters' report, that Officer Anyaso be given a CP-534 and lose twenty-four hours of leave or pay. (Matthew Dep. at 53.)

The Disciplinary Review Office forwarded its recommendation to the Bureau Commander, Deputy Chief Thomas Reynolds. As Bureau Commander, Deputy Chief Reynolds was the individual ultimately responsible for determining the appropriate disciplinary action for Officer Anyaso. While Deputy Chief Reynolds agreed with the Disciplinary Review Office's conclusion that plaintiff was at fault for the accident, he concluded that the penalty was insufficient. (Decl. of Thomas P. Reynolds, Def.'s Ex. 5 [ECF No. 17-6], at ¶¶ 6,11.) On January 9, 2012, Deputy Chief Reynolds decided that a more appropriate punishment was a CP-535 (a command discipline form that permits a longer period of suspension than a CP-534) and a five-day suspension without pay. (*Id.* at ¶ 19.) In reaching this conclusion, Deputy Chief Reynolds emphasized that Officer Anyaso was impermissibly proceeding under Code One protocols while canvassing a vehicle, acted recklessly when he failed to slow down at the intersection, and failed to recall many of the facts relating to the event. (*Id.* at ¶¶ 12-18.) This

decision effectively ended the USCP's investigation and plaintiff was permitted to return to a USCP vehicle on January 10, 2012.

During the course of this investigation, plaintiff contends that he engaged in protected activity alleging race-based discrimination. In September 2011, he alleges that he complained to his supervisors Inspector Loughery, Captain Herle, and Lieutenant McArthur, who are white, that he was being treated differently from two white officers (Officers Mooney and Crouch) who, in plaintiff's view, were "similarly situated." (Amend. Compl. at ¶ 28.) These two officers were also responsible for accidents while on duty. In October 2011, plaintiff alleges that he specifically complained to Captain Herle that "he felt he was being discriminated against based on his race and [that he] would be filing a complaint to vindicate his rights." (*Id.* at ¶ 29.)

Plaintiff did not serve his suspension immediately after Officer Reynolds handed down his decision. As was Officer Anyaso's right, he filed a grievance (the term used for an appeal of disciplinary action within the USCP) on February 7, 2012, alleging that a five-day suspension was no longer justified in light of the fact that he had already completed a driver's retraining course and had been removed from a vehicle and placed on a fixed post for six months. (SOF at ¶ 55.) However, after reviewing the case, Deputy Chief Garner denied plaintiff's grievance. (*Id.* at ¶ 56.) On March 8, 2012, Officer Anyaso appealed Deputy Chief Garner's decision to Chief of Police Phillip Morse, Sr. (*Id.* at ¶¶ 58-59.) After his detailed review of the case, Chief Morse denied plaintiff's appeal on June 1, 2012. In reaching his conclusion, Chief Morse focused both on Officer Anyaso's decision to proceed Code One in a situation that did not warrant such a protocol and his inability to remember any of the salient details necessary to investigate the crash. In addition, Chief Morse noted that plaintiff had caused more than $15,000 to a USCP vehicle and had forced the USCP to pay more than$19,000 in tort damages. (*Id.* at ¶¶ 62-72.) As

6

this was the final step in the grievance review process, plaintiff served his suspension in July 2012. He continues to work for the USCP to this day.

While plaintiff's case worked its way through the grievance process, plaintiff also began separate proceedings with the USCP Office of Compliance alleging discrimination and retaliation. On February 22, 2012, plaintiff sought counseling with the Office of Compliance. (OCC Certification of Record, Def.'s Ex. 12 [ECF No. 17-13].). He acknowledged receipt of his end of mediation notice on May 14, 2012. (*Id.*) Plaintiff sought counseling again with the Office of Compliance on August 2, 2012. (OCC Certification of Record, Def.'s Ex. 13 [ECF No. 17-14].) He acknowledged receipt of the end of mediation notice on November 19, 2012. (*Id.*).

## ANALYSIS

### I. STANDARD OF REVIEW

A motion for summary judgment is appropriate when the pleadings, the discovery, the disclosure materials on file, and any affidavits show that "there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). A genuine dispute as to a material fact exists if a "reasonable jury could return a verdict for the non-moving party." *Galvin v. Eli Lilly & Co.*, 488 F.3d 1026, 1031 (D.C. Cir. 2007) (quoting *Anderson*, 477 U.S. at 248). A moving party is thus entitled to summary judgment against "a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Waterhouse v. Dist. of Columbia*, 298 F.3d 989, 992 (D.C. Cir. 2002) (quoting *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986)). When considering a motion for summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson,* 477 U.S. at 255.

However, the non-moving party "may not rely merely on allegations or denials in its own pleading," *see* Fed. R. Civ. P. 56(c), but instead must offer specific facts showing that genuine issues exist for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986).

## II. DISCRIMINATION

Under the CAA, it is unlawful for the USCP to discriminate against any of its employees on the basis of race. 2 U.S.C. §§ 1301(3)(D), 1311(a)(1). Courts analyze CAA discrimination claims under the same standards as discrimination claims brought under Title VII. *Halcomb v. Office of the Sergeant at Arms*, 563 F. Supp. 2d 228, 239 (D.D.C. 2008). As the Court of Appeals has explained, the "two essential elements" of such claims are "that (i) plaintiff suffered an adverse employment action (ii) because of the plaintiff's race . . . ." *Baloch v. Kempthorne,* 550 F.3d 1191, 1196 (D.C. Cir. 2008).

In the absence of direct evidence, discrimination claims are assessed under the burden-shifting framework first set out by the Supreme Court in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802-03 (1973). Pursuant to that framework, the plaintiff has the initial burden of establishing a *prima facie* case of discrimination by a preponderance of the evidence. *Tex. Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 252-53. A *prima facie* case of discrimination requires plaintiff to show that (1) he is a member of a protected class; (2) he suffered an adverse employment action; and (3) the unfavorable action gives rise to an inference of discrimination. *Wiley v. Glassman,* 511 F.3d 151, 155 (D.C. Cir. 2007) (internal quotation marks omitted).

After the plaintiff has made out his *prima facie* case, "the burden shifts to the defendant 'to articulate some legitimate, nondiscriminatory reason for the [challenged employment action].'" *Id.* (quoting *McDonnell Douglas,* 411 U.S. at 802). The D.C. Circuit has stressed,

however, that once an employer has proffered a nondiscriminatory reason, the *McDonnell Douglas* burden-shifting framework disappears, and the court simply must determine whether the plaintiff has put forward enough evidence to defeat the proffer and support a finding of discrimination. *Woodruff v. Peters,* 482 F.3d 521, 530 (D.C. Cir. 2007); *see also Brady v. Office of the Sergeant at Arms,* 520 F.3d 490, 494 (D.C. Cir. 2008) ("[W]here an employee has suffered an adverse employment action and an employer has asserted a legitimate, non-discriminatory reason for the decision, the district court need not—*and should not*—decide whether the plaintiff actually made out a prima facie case under *McDonnell Douglas*." (emphasis in original)).

Officer Anyaso identifies four alleged adverse employment actions taken by defendant that form the foundation of his *prima facie* case of discrimination. They include: (1) his temporary removal from a USCP vehicle between June 2011 and January 2012, (2) his assignment to a fixed post during that same time period, (3) his mandatory attendance at a driver's recertification course in August 2011, and (4) his suspension for five days without pay that was ultimately served in July 2012. Defendant responds that each of the first three alleged adverse actions fail to rise to the level of material adversity necessary to establish a *prima facie* case of discrimination, whereas defendant concedes that the suspension constitutes an adverse action. (*See* Mot. at 14-16.) However, defendant argues that it is still entitled to summary judgment on the grounds that it had a legitimate, non-discriminatory justification for taking that action and plaintiff cannot, as a matter of law, demonstrate that this justification was pretextual. (*See* Mot. at 20-27.) For the reasons discussed below, the Court agrees with the defendant and will grant its motion for summary judgment on plaintiff's discrimination claim.

### A. Removal from Vehicle, Assignment to a Fixed Post, and Mandatory Driver's Retraining Course

Generally, once a defendant has proffered a legitimate, non-discriminatory reason for the challenged action, a court need not consider whether the plaintiff has established a *prima facie* case of discrimination. *Brady,* 520 F.3d at 494. However, when—as here—defendant contests the existence of an adverse action, the court may consider that issue first. *Franklin v. Potter,* 600 F. Supp. 2d 38, 63 (D.D.C. 2009); *see Baloch,* 550 F.3d at 1196-97 (engaging in adversity inquiry first).

In the discrimination context, an adverse employment action is defined narrowly as "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing significant change in benefits." *Douglas v. Donovan,* 559 F.3d 549, 552 (D.C. Cir. 2009) (citations and internal quotation marks omitted). "[A]n employee suffers an adverse employment action if he experiences materially adverse consequences affecting the terms, conditions, or privileges of employment or future employment opportunities such that a reasonable trier of fact could find objectively tangible harm." *Forkkio v. Powell,* 306 F.3d 1127, 1131 (D.C. Cir. 2002) (citing *Brown v. Brody,* 199 F.3d 446, 457 (D.C. Cir. 1999)). In most circumstances, tangible harm "inflicts *direct* economic harm." *Douglas,* 559 F.3d at 552 (quoting *Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742, 762 (1998)). "'[P]urely subjective injuries,' such as dissatisfaction with a reassignment, or public humiliation or loss of reputation are not adverse actions . . . ." *Holcomb v. Powell,* 433 F.3d 889, 902 (D.C. Cir. 2006) (quoting *Forkkio,* 306 F.3d at 1130-31). Only a "'reassignment with significantly different responsibilities' . . . generally indicates an adverse action." *Forkkio,* 306 F.3d at 1131 (quoting *Burlington Indus.*, 524 U.S. at 761).

It is undisputed that following the accident and during the pendency of USCP's six-month investigation, defendant prohibited plaintiff from driving a USCP vehicle, assigned plaintiff to a fixed post, and mandated that he complete a driver recertification course. Yet, while Officer Anyaso may have disliked these actions, as defendant correctly points out, Officer Anyaso "worked the same shift, had the same benefits, and had the same duties of a police officer" and "did not lose any salary or overtime as a result [of defendant's actions]." (Mot. at 15.) Therefore, under *McDonnell Douglas* and its progeny, these actions are not materially adverse and cannot, as a matter of law, form the basis of his *prima facie* case of discrimination.[2]

### B. Plaintiff's Suspension Without Pay

Unlike plaintiff's first three alleged adverse actions, his suspension for five days without pay constitutes a materially adverse action for purposes of establishing a *prima facie* case of discrimination because it caused him financial loss. *See Douglas*, 559 F.3d at 552. Yet, the Court's inquiry does not end there. If defendant is able to articulate a legitimate, non-discriminatory justification for this suspension, the burden shifts back to the plaintiff to demonstrate that a reasonable jury could conclude "by a preponderance of the evidence that the legitimate reason[ ] offered by the defendant [was] not its true reason[ ], but [was] a pretext for

---

[2] In an effort to rescue this claim, defendant argues that his temporary removal from a USCP vehicle had the direct financial impact of preventing him from working special events that would have entitled him to overtime pay. (Mot. at 15.) The trouble with this argument, however, is that the evidence clearly demonstrates that plaintiff was permitted to work special events on no fewer than four occasions during the relevant period despite the fact that he was not permitted to operate a USCP vehicle. (*See* Decl. of Lawrence Loughery, Def.'s Ex. 3 [ECF No. 17-4], at¶ 8.) The mere conclusory assertion that he *might* have had additional opportunities for overtime if the USCP had not revoked his driving privileges is therefore not a sufficient basis to withstand defendant's motion for summary judgment. *See Bell v. Gonzales,* 398 F. Supp. 2d 78, 97 (D.D.C. 2005); *see also Broska v. Henderson,* 70 Fed. Appx. 262, 267-68 (6th Cir. 2003) ("While we again stress that allegations of a denial of overtime, properly supported, could constitute an adverse employment action, [plaintiff] has put forth virtually no evidence on the overtime issue.")

11

discrimination." *Burdine,* 450 U.S. at 253; *see also Aka v. Washington Hosp. Cent.,* 156 F.3d 1284, 1289 n.3 (D.C. Cir. 1998). "It is not enough for the plaintiff to show that a reason given for a[n adverse] action is not just, or fair, or sensible. He must show that the explanation given is a phony reason." *Fischbach v. D.C. Dep't of Corr.*, 86 F.3d 1180, 1183 (D.C. Cir. 1996) (citing *Pignato v. American Trans Air, Inc.*, 14 F.3d 342, 349 (7th Cir. 1994)).

Defendant argues in its motion for summary judgment that the legitimate, non-discriminatory justification for suspending plaintiff was that he violated "[d]epartmental policy by inappropriately proceeding Code One while canvassing for a vehicle" and "inappropriately r[unning] through a red light and caus[ing an] accident" that resulted in more than $15,000 in damages to his USCP vehicle and more than $19,000 in damages paid by the USCP to the driver of the other vehicle. (Mot. at 20, 23.) In addition, defendant emphasizes that plaintiff refused to participate fully in the investigation and never took full responsibility for his actions. (*Id.* at 21.) The legitimate and non-discriminatory nature of the USCP's decision to suspend plaintiff is supported further by the detailed process that the USCP undertook to reach its decision. Through this process, no fewer than six individuals concluded that plaintiff was responsible for a preventable accident, and three individuals concluded that a five-day suspension without pay was an appropriate punishment considering the facts of the case.

Since defendant has articulated a legitimate, non-discriminatory reason for this adverse employment action, the burden now shifts back to the plaintiff to demonstrate that a reasonable jury could conclude by a preponderance of the evidence that defendant's non-discriminatory reasons for undertaking this particular adverse action were actually pretextual. Plaintiff attempts to satisfy this burden in two ways.

First, plaintiff challenges the underlying evidence against him. He argues that while the evidence cited by the defendant indicates that the crime in progress was an assault (a misdemeanor offense), he honestly believed at the time that it could be a felony and that Code One protocols were therefore justified. (Opp. at 10.) At his deposition, plaintiff testified that, "when an assault comes out, we don't determine until we actually get to the scene exactly what type of charge [felony or misdemeanor] happens." (Dep. of Lawrence Anyaso, Def.'s Ex. 1 [ECF No. 17-2], at 17.) Moreover, he also testified that he was "being told that [the assailant] . . . is on top of her [s]o there is continuous crimes of violence being alleged against the person" and that he proceeded Code One because he is "authorized to protect people that are in imminent loss of life or serious bodily injury. . . ." (*Id.* at 18-19, 21.)

Yet, in so arguing plaintiff misconstrues the relevant inquiry for the Court. As the D.C. Circuit has explained, "the question is not whether the underlying [] incident[s] occurred; rather the issue is whether *the employer honestly and reasonably believed* that the underlying [] incident[s] occurred." *Brady*, 520 F.3d at 495 (emphasis in original); *see also Waterhouse*, 298 F.3d at 995 ("At best, her responses constituted an argument that, notwithstanding those failings, the District should not have terminated her because there were extenuating circumstances . . . But courts are without authority to second-guess an employer's personnel decision absent demonstrably discriminatory motive.") (internal citations and quotation marks omitted).

Plaintiff's arguments amount to little more than a proffer that he believed that the suspect might have committed a felony and that proceeding Code One to canvas was appropriate in light of the particular circumstances. The relevant question for the Court, however, is whether the defendant has shown that *it* had an honest, reasonable belief that the underlying incidents occurred in a way that justified the five-day suspension. Based on the evidence presented, the

13

Court must conclude that it did. As defendant correctly notes in its motion, "there are no facts to support [p]laintiff's assertion . . . the call went out as a simple assault which is a misdemeanor" and "[p]laintiff . . . admit[ted] that he was looking [canvassing] for a vehicle and not in pursuit of it." (Mot. at 20-21.) Because the Court concludes that defendant had an honest and reasonable basis to conclude that the crime in progress was a misdemeanor and that plaintiff proceeded under Code One protocols while canvassing and not pursuing a suspect, a reasonable jury could not conclude that defendant's justifications for punishing defendant were pretextual.

Second, plaintiff argues that a reasonable jury could conclude that defendant's justifications for his suspension were pretextual because he was subjected to a more severe punishment than other non-African-American USCP officers who committed similar offenses. (Opp. at 10-11.) To permit a jury to reach such a conclusion, however, plaintiff must first establish that the alleged comparators are sufficiently "similarly situated." *See Baloch*, 550 F.3d at 1201. In this Circuit, that means that "all of the relevant aspects of h[is] employment situation were 'nearly identical' . . . ." *See Neuren v. Adduci, Mastriani, Meeks & Schill,* 43 F.3d 1507, 1514 (D.C. Cir. 1995) (quoting *Pierce v. Commonwealth Life Ins. Co.,* 40 F.3d 796, 802 (6th Cir. 1994)). "To make this determination, courts look to, *inter alia*, whether the alleged comparators dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *McFadden v. Ballard, Spahr, Andrews & Ingersoll, LLP*, 580 F. Supp. 2d 99, 109-10 (D.D.C. 2008) (internal citations and quotation marks omitted), *aff'd in relevant part and rev'd on other grounds*, 611 F.3d 1 (D.C. Cir. 2010).

Courts must rely on evidence substantiated by the record to reach this conclusion. *See Parker-Darby v. Dep't of Homeland Sec.*, 869 F. Supp. 2d 17, 23 (D.D.C. 2012).[3]

Plaintiff's opposition identifies two sets of potential comparators. The first includes "Officers Jeremy Nelson and Mathew Shelfo, both Caucasian, who," plaintiff alleges, "travelled right behind [plaintiff] in Code 1 mode [but] were never investigated or disciplined." (Opp. at 10.) Plaintiff contends in his opposition, albeit in a conclusory fashion, that because Officers Nelson and Shelfo also proceeded under Code One protocols that they should have been investigated and ultimately suspended—and, more importantly, the fact that they were not indicates pretext on the part of USCP. (*Id.*) The problem with this reasoning is that even if these officers did proceed Code One in violation of departmental policy and even if they were in the same chain of command—facts which plaintiff has failed to demonstrate based on any record evidence whatsoever—these officers did not do cause a significant traffic accident that resulted in monetary damage and property damage like plaintiff. Therefore, whatever similarities these other officers had with plaintiff, their conduct was not "sufficiently similar" so as to render them comparators.

The second set of alleged comparators identified by plaintiff includes Officers Mooney and Crouch. While the conduct of these officers was similar to plaintiff's conduct insofar as they both caused traffic accidents while operating UCSP vehicles, there is an insufficient basis to conclude that their employment situation was "nearly identical" to the plaintiff's. Plaintiff has presented no evidence that these officers' traffic accidents occurred after improperly proceeding

---

[3] As defendant correctly notes, most of plaintiff's assertions regarding comparators are not substantiated with specific citations to the record. That said, the Court is satisfied that even if all of the unsupported allegations made in defendant's opposition were true, plaintiff would still not satisfy its burden to identify "nearly identical" comparators. The Court will therefore analyze defendant's arguments as if all of the proper record citations were included.

Code One to canvass for a suspect, that their accident caused the level of damage to others that plaintiff's accident did, or that they refused to accept responsibility for their actions.

Ultimately, the Court concludes that plaintiff is unable to sustain its burden of establishing a *prima facie* case of discrimination on the grounds that defendant removed plaintiff from his USCP vehicle, assigned him to a fixed post, and required that he complete a driver recertification course. In addition, plaintiff has not presented sufficient evidence that a reasonable jury could conclude that defendant's legitimate, non-discriminatory reason for suspending him for five days without pay was actually a pretext for discriminating against him on the basis of race. The Court must therefore grant defendant's summary judgment motion on plaintiff's discrimination claim.

## III. RETALIATION

As defendant correctly notes in its Reply, "Plaintiff's Opposition does not appear to address any of Defendant's arguments regarding retaliation." (Def.'s Reply to Pl.'s Opp. to Mot. for Summ. J., Mar. 6, 2014 [ECF No. 28]. at 7.) In fact, the word "retaliation" does not even appear in plaintiff's opposition. For this reason alone, the Court may treat defendant's argument as conceded and defendant's motion for summary judgment on plaintiff's retaliation claim will be granted. *See Hopkins v. General Bd. of Global Ministries,* 284 F. Supp. 2d 15, 25 (D.D.C. 2003) ("It is well understood in this Circuit that when a plaintiff files an opposition to a dispositive motion and addresses only certain arguments raised by the defendant, a court may treat those arguments that the plaintiff failed to address as conceded."); *Day v. D.C. Dep't of Consumer & Regulatory Affairs,* 191 F. Supp. 2d 154, 159 (D.D.C. 2002) ("If a party fails to counter an argument that the opposing party makes in a motion, the court may treat that argument as conceded.").

That said, even if the Court were to proceed to the merits of plaintiff's retaliation claim, defendant's motion for summary judgment on this claim would still be granted. Under the CAA, it is "unlawful for an employing office to intimidate, take reprisal against, or otherwise discriminate against, any covered employee because the covered employee has opposed any practice made unlawful by [the CAA,] or because the covered employee has initiated proceedings, made a charge, or testified, assisted, or participated in any manner in a hearing or other proceeding under [the CAA.]" 2 U.S.C. § 1317. These claims are analyzed under the same rubric as Title VII retaliation claims. *See Newton v. Office of the Architect of the Capitol*, 905 F. Supp. 2d 88, 92 (D.D.C. 2012). In order to make out a *prima facie* case, a plaintiff must establish that "(1) that he engaged in a statutorily protected activity; (2) that he suffered a materially adverse action by his employer," *Jones v. Bernanke,* 557 F.3d 670, 677 (D.C. Cir. 2009); and (3) that "his . . . protected activity was a but-for cause of the . . . adverse action by the employer." *Univ. of Texas Sw. Med. Ctr. v. Nassar,* 133 S.Ct. 2517, 2534 (June 24, 2013).

According to his amended complaint and his opposition, plaintiff did not engage in any "protected activity" until September 2011 when he first met with his supervisors and complained that he "was being [treated] differently from [white officers] . . . who were similarly situated." (Amend. Compl. ¶ 28). In October 2011, he "met Captain Herle in the hallway and told him that he felt he was being discriminated against based on his race and would be filing a complaint to vindicate his rights." (*Id.* at ¶ 29.) Then, in February 2012, he filed a formal discrimination complaint with the USCP's Office of Compliance. (*Id.* at ¶ 33.)

A majority of the alleged adverse actions pre-date this protected activity and therefore cannot form the basis of a retaliation claim. *See Booth v. Dist. of Columbia.*, 701 F. Supp. 2d. 73, 78-79. These include the transfer of plaintiff to a fixed post checkpoint (June 2011), the

revocation of his USCP driving privileges (June 2011), and the mandatory completion of a driver training course (August 2011). The only alleged adverse actions that occurred *after* this protected activity were the decision to suspend plaintiff in January 2012 and the decision by the Acting Chief to "sustain" this suspension in July 2012. The difficulty here for plaintiff is that there is no basis in the record by which a reasonable jury could find that the "but for" cause of plaintiff's suspension and the Chief's decision to sustain that suspension were in retaliation for his protected activities. To the contrary, even if the Court could conclude that retaliatory animus played some role in the decision to suspend plaintiff for five days without pay—which would be, at best, difficult to conclude—the presence of a clear non-retaliatory justification for the suspension, *see supra* Section II(B), would make it impossible for a reasonable jury to conclude that the but-for cause of plaintiff's suspension without pay was his protected activities.

## CONCLUSION

Accordingly, and for the reasons stated above, the summary judgment motion will be granted. A separate order accompanies this Memorandum Opinion.

/s/
ELLEN SEGAL HUVELLE
United States District Judge

Date: April 17, 2014